## A93A2265. KNIGHT v. STURM et al.

(442 SE2d 255)

BEASLEY, Presiding Judge.

On January 6, 1992, Knight filed a complaint against Dr. Hiram Sturm, his physician-partners, his medical partnership, and the manufacturers and sellers of liquid silicone used as an injectable substance in humans.

Plaintiff was referred by her physician, Dr. Forshner, to Dr. Sturm for treatment of facial scarring that resulted from plaintiff's chronic acne problems. On January 16, 1986, Dr. Sturm, a dermatologist, began the silicone injections which are the subject of this lawsuit. Plaintiff testified that Dr. Sturm told her that the silicone could harden but that if it did, it could easily be treated with cortisone injections. The final injection was administered by Dr. Sturm on April 7, 1988, and plaintiff was last treated by him on September 26, 1988.

In either December 1988 or January 1989, plaintiff began to notice "knots" arising on her face in those places where silicone had been injected. At this time, plaintiff was under the care of Dr. Labrador. On March 16, 1989, Dr. Labrador informed plaintiff that the use of liquid silicone had not been approved by the FDA, and he advised plaintiff that the silicone knots "need to be" surgically removed from her face. Dr. Labrador excised two or three within a week. Plaintiff testified that at no time did Dr. Sturm inform her that liquid silicone injections were not approved by the FDA or that adverse reactions were possible. Dr. Sturm testified otherwise.

On January 10 or 11, 1990, plaintiff's skin became swollen, red, and inflamed in several locations on her face. Efforts to reduce the swelling through medication proved ineffective, and in 1991 she returned to Dr. Labrador to have the inflamed areas surgically excised and silicone removed. This surgery has caused new scarring to her face. In addition, her face has continued to swell and become inflamed, and numerous lesions have formed.

The trial court granted the defendant physicians' motion for summary judgment, on the ground that plaintiff's claims against these defendants began to run on March 16, 1989, and this action was not filed within the two-year medical malpractice statute of limitation, OCGA § 9-3-71 (a).

1. Plaintiff contends that the limitation period did not begin to run until January 10, 1990, when her face erupted in an inflammatory reaction never before experienced by her.

OCGA § 9-3-71 (a) states, "Except as otherwise provided in this article, an action for medical malpractice shall be brought within two years after the date on which an injury or death arising from a negligent or wrongful act or omission occurred."

"The Supreme Court has recognized that 'there are four points at

which a tort cause of action *may accrue*: (I) (w)hen the defendant breaches his duty; (II) when the plaintiff is first injured; (III) when the plaintiff becomes aware of his injury; or (IV) when the plaintiff discovers the causal relationship between his injury and the defendant's breach of duty.' [(Emphasis in original.)] [Cits.]" *Jones v. Lamon*, 206 Ga. App. 842, 844 (1) (426 SE2d 657) (1992).

The evidence in this case shows without conflict that plaintiff discovered or became aware of the injury no later than March 16, 1989, when Dr. Labrador informed her that the silicone needed to be surgically removed because of the knots on her face, which knots actually manifested themselves two or three months earlier than that date. Consequently, the limitation period began to run at the latest by that date (point III). See *Vitner v. Miller*, 208 Ga. App. 306 (430 SE2d 671) (1993), and *Jones*, supra (where several concurrences and dissents could not agree on whether the statute begins to run when the plaintiff is first injured (point II) or when the plaintiff becomes aware of the injury (point III)); see also *Bryant v. Crider*, 209 Ga. App. 623 (3) (434 SE2d 161) (1993).

In reliance upon *Stephen W. Brown Radiology Assoc. v. Gowers*, 157 Ga. App. 770, 773 (1) (278 SE2d 653) (1981), plaintiff argues that the knots which arose on her face did not begin the running of the limitation period because Dr. Sturm advised her that this was a normal reaction to his treatment. However, he did not advise her that the necessity of surgical removal of the silicone was also normally to be expected. It was, at the latest, at the time she learned of this in March 1989 that the statute began to run.

2. Plaintiff contends that OCGA § 9-3-71 (a) is inapplicable to her additional claims, which are based not on medical malpractice, but rather on fraudulent representations, fraudulent concealment of material information, breach of express and implied warranties, and breach of contract.

The medical malpractice statute of limitation applies to malpractice actions founded upon either tort or contract theories of liability. *Johnson v. Gamwell*, 165 Ga. App. 425, 426 (301 SE2d 492) (1983); *Verre v. Allen*, 175 Ga. App. 749, 750 (334 SE2d 350) (1985). It applies to all claims arising out of a medical malpractice cause of action. *Ballard v. Rappaport*, 168 Ga. App. 671 (310 SE2d 4) (1983). A suit is a medical malpractice action where, as here, it calls into question the conduct of a professional in his area of expertise. *Candler Gen. Hosp. v. McNorrill*, 182 Ga. App. 107, 110 (2) (354 SE2d 872) (1987). OCGA § 9-3-71 (a) is applicable to plaintiff's fraud and contract claims.

" 'The statute of limitation is tolled only if defendant is "guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action. . . ." OCGA § 9-3-96. . . . Once (plaintiff) sought the diagnosis or care of another doctor who informed (her) of the ex-

istence of medical problems, (she was) no longer deterred from learning the true facts.' [Cit.]" *Padgett v. Klaus*, 201 Ga. App. 399, 400 (411 SE2d 126) (1991).

3. Plaintiff argues that the defendant physicians may not invoke the protection of the statute of limitation found in OCGA § 9-3-71, because their actions were unauthorized by law.

In pertinent part, OCGA § 9-3-70 states, "As used in this article, the term 'action for medical malpractice' means any claim for damages resulting from the death of or injury to any person arising out of: (1) Health, medical, dental, or surgical service, diagnosis, prescription, treatment, or care *rendered by a person authorized by law to perform such service* or by any person acting under the supervision and control of the lawfully authorized person. . . ." (Emphasis supplied.)

Plaintiff does not dispute that Dr. Sturm as a duly licensed physician was a person authorized by state law to perform medical services. Plaintiff argues that Dr. Sturm was not a person authorized by federal law to perform this particular service, because he was not licensed to participate in the clinical study of this experimental device.

Plaintiff's expert testified that liquid silicone was supplied by the manufacturer under FDA restrictions for investigative purposes only from 1976 through 1981 and that Dr. Sturm was not one of the investigators certified by the FDA to participate in the original study. Dr. Sturm testified that although he was not licensed by the FDA to do investigational work with the silicone procedure, it was only during this earlier period that exclusively persons so licensed could administer this procedure; during this period, he did not administer it; and he ceased the procedure using liquid silicone when he was advised that the FDA was considering it illegal. As previously stated, Dr. Sturm performed the silicone injection procedures on plaintiff between 1986 and 1988. Plaintiff's expert's testimony does not support her allegation that Dr. Sturm was not a person authorized by federal law to perform this service.

Plaintiff's expert did testify that the FDA has never approved liquid silicone for injection for any cosmetic purpose; that as a consequence, the injection of liquid silicone into the skin for any purpose required the patient's approval on an experimental treatment consent form, even for the original designated investigators; and that there is no evidence that plaintiff signed an experimental procedure consent.

Such failure by Dr. Sturm to obtain Knight's required consent would mean that he did not perform this service in a lawfully authorized manner. However, he would still be a "person" authorized by law to perform such service. Accord *Central Anesthesia Assoc., P. C. v. Worthy*, 254 Ga. 728 (333 SE2d 829) (1985); *Poss v. Callaway*, 185 Ga. App. 247 (1) (363 SE2d 782) (1987).

*Judgment affirmed. Cooper and Smith, JJ., concur.*

DECIDED FEBRUARY 28, 1994 —
RECONSIDERATION DENIED MARCH 11, 1994 — 

*Gleason, Davis & Dunn, John W. Davis, Jr., David J. Dunn, Jr.,* for appellant.

*Long, Weinberg, Ansley & Wheeler, Robert D. Roll, Daniel W. Sweat,* for appellees.